Ali Moghaddas (SBN 305654)
amoghaddas@edelson.com
EDELSON PC
11601 Wilshire Boulevard, Suite 1970
Los Angeles, California 90025
Tel: (310) 694-0331

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| TIMM SCHOFIELD and REBEKAH SCHOFIELD, individually, and as successors-in-interest to decedent E.S., a minor,<br><br>*Plaintiffs*,<br><br>v.<br><br>SAMUEL ALTMAN, an individual, OPENAI FOUNDATION, a Delaware corporation, OPENAI OPCO, LLC, a Delaware limited liability company, and OPENAI GROUP PBC, a Delaware public benefit corporation,<br><br>*Defendants*. | Case No.:<br><br>**COMPLAINT FOR:**<br><br>**(1) Negligence (Failure to Warn Law Enforcement);**<br>**(2) Negligent Entrustment;**<br>**(3) Aiding and Abetting a Mass Shooting;**<br>**(4) Negligence (Failure to Warn);**<br>**(5) Negligent Undertaking;**<br>**(6) Negligence (Design Defect);**<br>**(7) Strict Product Liability (Design Defect);**<br>**(8) Strict Product Liability (Failure to Warn);**<br>**(9) Violation of Cal. Bus. & Prof. Code § 17200 et seq.;**<br>**(10) Wrongful Death; and**<br>**(11) Survival Action.**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Timm Schofield and Rebekah Schofield, individually, and as successors-in-interest to decedent E.S., bring this Complaint and Demand for Jury Trial against Defendants Samuel Altman, OpenAI Foundation, OpenAI OpCo, LLC, and OpenAI Group PBC (collectively, "OpenAI," "OpenAI Defendants," or "Defendants," unless otherwise specifically stated), and allege as follows upon personal knowledge as to themselves and their own acts and experiences, and upon information and belief as to all other matters.

COMPLAINT                                    1

## **NATURE OF THE ACTION**

1.     On the morning of February 10, 2026, an eighteen-year-old shot and killed their mother and eleven-year-old brother in their family home in Tumbler Ridge, British Columbia. The Shooter then drove to Tumbler Ridge Secondary School with a modified rifle and opened fire. They killed six people inside the school, including five children, and wounded twenty-seven more before killing themself. It was one of the deadliest mass shootings in Canadian history.

2.     E.S. was a thirteen-year-old student at Tumbler Ridge Secondary School. He was killed outside the school library.

3.     Tragically, E.S.'s family is not the only one to bury a child or say goodbye through a body bag. Tumbler Ridge is a mining town of roughly 2,000 people, and the attack touched nearly every family in it. Children watched classmates shot at point-blank range and a teacher killed in front of them. They hid in bathroom stalls and closets, praying the Shooter would not hear them. Some pulled the injured and the dead into their hiding places, careful not to leave trails of blood that could lead the Shooter to them. Parents were asked to identify their children by their clothing, because the gunshots had left little else to recognize. The survivors—students, teachers, and parents alike—are living with physical and psychological injuries that will never fully heal. Tumbler Ridge Secondary School has been closed and will be razed. The children who can return to school at all are doing so in trailers set up as makeshift classrooms.

4.     In the weeks that followed the attack, a sickening truth emerged: ChatGPT played a role in the mass shooting and OpenAI could have, and should have, prevented it. Sadly, the victims didn't learn this because OpenAI was forthcoming, but because its own employees leaked it to the Wall Street Journal after they could no longer stomach the company's silence. Those whistleblower disclosures and OpenAI's eventual admissions revealed that ChatGPT deepened the Shooter's violent fixation and pushed them toward the attack—the predictable result of a design choice OpenAI made to let ChatGPT engage with users about violence in the first place. But the design choice was not the worst of it. OpenAI knew the Shooter was planning the attack and, after a contentious internal debate, made the conscious decision not to warn authorities.

5. In June 2025, just eight months before the attack, OpenAI's automated system flagged the Shooter's ChatGPT account for gun violence activity and planning. The account was routed to members of a specialized safety team who reviewed the conversations and determined that the Shooter posed a credible and specific threat of gun violence against real people. The safety team urged OpenAI to notify the Royal Canadian Mounted Police ("RCMP").

6. Sam Altman and his leadership team knew what silence meant for the citizens of Tumbler Ridge. They were focused on what disclosure meant for themselves. Warning the RCMP would set a precedent: OpenAI would be compelled to notify authorities every time its safety team identified a user planning real-world violence. Given the volume of chat-induced violence on ChatGPT, that would require a dedicated law enforcement referral team tasked with reporting OpenAI's own users to authorities. And the public would finally see what OpenAI was desperately trying to hide: that ChatGPT is not the safe, essential tool the company sells it as, but a product dangerous enough that its makers routinely identify its users as threats to human life.

7. For OpenAI, this was a question of corporate survival. OpenAI is on the cusp of an initial public offering ("IPO") at a valuation approaching one trillion dollars, a transaction that would make Sam Altman one of the wealthiest and most powerful people on earth. But Altman's reign is fragile. OpenAI's Board of Directors has fired Altman once before, in November 2023, for not being "consistently candid" about safety. So Altman and his team understood that revealing another instance of violence, where ChatGPT was helping a teenager plan yet another violent act—this time a mass shooting—could end his tenure, derail the IPO, and wipe out the company's valuation. They did the math and decided that the safety of the children of Tumbler Ridge was an acceptable risk.

8. The calculation is a familiar one. In the 1970s, Ford kept selling the Pinto after its own engineers warned that the fuel tank design would cause people to burn to death in rear-end collisions. Ford concluded that paying settlements to the families of the dead would cost less than fixing the car. OpenAI has made a version of the same calculation. For Ford, the dangerous design was a flaw in an otherwise ordinary product. But for OpenAI, the dangerous design *is* the product. The features that make ChatGPT unsafe—its willingness to engage on any topic, to validate any

user, to sustain any fixation over time—are the same features that have made it one of the most popular products in history. Fixing those features would cost OpenAI its market share, its path to an IPO, and hundreds of billions of dollars in valuation. It has decided that facing large judgments, even for children killed in mass shootings its product helped plan, costs less than telling the public what ChatGPT actually does.

9.      And so, in June 2025, company leaders overruled the safety team members, vetoed their recommendation to notify the RCMP, "deactivated" the Shooter's account, and kept what they had seen to themselves—hoping that whatever happened, it would not be traced back to the company. When the story eventually broke, Altman and OpenAI lied. First, they claimed to have "banned" the Shooter's account. But as explained below, OpenAI does not ban users. It only "deactivates" them—a process that can be reversed within minutes by registering a new account. The Shooter did exactly that, and continued using ChatGPT to plan the attack.

10.      When OpenAI was later forced to disclose that the Shooter created a new account, it told a second lie: it claimed they must have "evade[d]" the company's safeguards to create one. But there were no safeguards to evade. The Shooter simply followed OpenAI's own instructions to create a new account after being banned. The "safeguards" OpenAI pointed to after the attack did not fail; they did not exist. OpenAI lied because the truth is worse: the company does not ban users for violent activity. It tells them how to come back in.

11.      Those instructions were no accident. Neither were the missing safeguards. They are part of a pattern. After every tragedy, OpenAI promises to do better. But it never promises to do the one thing that would actually make a difference: stop ChatGPT from engaging with users about violence and self-harm in the first place. When ChatGPT was first offered to consumers in 2022, it was programmed to categorically refuse those conversations. But OpenAI stripped out that safeguard in May 2024 when it realized that refusals were suppressing user engagement. For OpenAI, engagement is the whole business—every conversation trains the next model, and every minute a user spends in ChatGPT grows its market share. OpenAI therefore programmed ChatGPT to participate in almost any conversation a user brings to it, no matter how dangerous.

12.      OpenAI failed to apologize for its role in the shooting for over two months after the

attack. It was not until the RCMP announced its investigation was in its "final stages," and not until Premier David Eby and Mayor Darryl Krakowka privately pressed him to respond, that Sam Altman finally published a late-Friday letter to the community. In it, he acknowledged, "I am deeply sorry that we did not alert law enforcement to the account that was banned in June." But Altman announced no changes to its law enforcement referral policy and did not even commit to restoring the pre-May 2024 refusal safeguards. He instead offered what OpenAI has offered after every prior tragedy—that the company's "focus will continue to be on working with all levels of government to help ensure something like this never happens again"—without identifying a single operational change, let alone one that would make a difference. Had OpenAI's original safeguards remained in place, ChatGPT would have refused to discuss violence with the Shooter at all, and E.S. would be alive today.

13.     Accordingly, Plaintiffs bring this action to hold Sam Altman and OpenAI accountable for designing a dangerous product, ignoring the warnings of their own safety team, refusing to notify authorities when they knew the Shooter was planning a mass attack, inviting them back onto the platform after deactivating their account, and choosing profit over the lives of the children of Tumbler Ridge.

## PARTIES

14.     Plaintiffs Timm Schofield and Rebekah Schofield are natural persons and residents of the Province of British Columbia, Canada. They are Canadian citizens. They are the parents of decedent E.S. They bring this action individually and as successors-in-interest to decedent E.S., who was thirteen years old at the time of his death on February 10, 2026. E.S. was a citizen of Canada. Plaintiffs shall file the declarations required by California Code of Civil Procedure section 377.32 shortly after the filing of this Complaint.

15.     Defendant Samuel Altman is a natural person residing in San Francisco, California. He is a citizen of California. As co-founder and Chief Executive Officer of OpenAI, Altman directed the design, development, safety policies, and deployment of ChatGPT. In 2024, Altman knowingly accelerated GPT-4o's public launch while deliberately bypassing critical safety protocols.

16.     Defendant OpenAI Foundation (formerly known as OpenAI, Inc.) is a Delaware corporation with its principal place of business in San Francisco, California. At all relevant times, OpenAI, Inc. was the nonprofit parent entity that governed the OpenAI organization and exercised oversight over its for-profit subsidiaries, including OpenAI OpCo, LLC. As the governing entity, OpenAI, Inc. was responsible for defining the organization's safety mission, establishing its risk-management framework, and publishing the official "Model Specifications" that set the policies and requirements applicable to the development and deployment of OpenAI's artificial intelligence models.

17.     Defendant OpenAI OpCo, LLC is a Delaware limited liability company with its principal place of business in San Francisco, California. OpenAI OpCo, LLC is the for-profit operating entity within the OpenAI corporate structure, responsible for the development, deployment, and commercialization of the defective product at issue. OpenAI OpCo, LLC managed and operated the ChatGPT product that the Shooter used to plan their attack, including the infrastructure and systems through which GPT-4o was delivered to end users. On information and belief, the members of OpenAI OpCo, LLC include OpenAI Foundation, a Delaware nonprofit nonstock corporation with its principal place of business in California. On information and belief, tracing through each tier of ownership to its ultimate natural-person and corporate members, no member of OpenAI OpCo, LLC is a citizen or subject of Canada.

18.     Defendant OpenAI Group PBC is a Delaware public benefit corporation with its principal place of business in San Francisco, California. OpenAI Group PBC was formed on October 28, 2025, as part of a corporate restructuring consolidating OpenAI's for-profit operations. On December 31, 2025, OpenAI Holdings, LLC—the for-profit holding entity that owned the core intellectual property underlying GPT-4o and the other commercial models at issue—merged into OpenAI Group PBC and ceased to exist. As successor to OpenAI Holdings, LLC and the other predecessor for-profit entities, OpenAI Group PBC is liable for their conduct, designed, deployed, and profited from ChatGPT, and continues to do so today.

19.     OpenAI Defendants collectively played the most direct and consequential roles in the design, development, approval, and deployment of the defective product at issue. OpenAI

Foundation established the safety mission it failed to enforce. OpenAI OpCo, LLC built, deployed, and sold the defective product at issue. OpenAI Group PBC owns the underlying technology and is liable as successor to the predecessor for-profit entities that profited from it. Samuel Altman is named as the chief executive who personally directed the reckless strategy of prioritizing a rushed market release over the safety of vulnerable users and the public. Together, these Defendants represent the key actors whose decisions directly caused the harm at issue.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiffs are citizens of Canada, OpenAI Defendants are citizens of California, and the amount in controversy exceeds the sum of $75,000.00.

21.    This Court has personal jurisdiction over the OpenAI Defendants because they conduct business in this District, reside in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

22.    Venue is proper in this District under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to Plaintiffs' claims occurred in and emanated from this District, and OpenAI Defendants reside in this District.

## DIVISIONAL ASSIGNMENT

23.    Pursuant to Civil L.R. 3-2(c), divisional assignment to San Francisco is appropriate, because OpenAI is headquartered in San Francisco County and a substantial part of the events or omissions giving rise to the claim occurred in San Francisco County.

## FACTUAL BACKGROUND

**I.     The Tumbler Ridge Mass Shooting.**

24.    On February 10, 2026, an eighteen-year-old resident of Tumbler Ridge, British Columbia carried out one of the deadliest mass shootings in Canadian history. The Shooter first shot and killed their mother and eleven-year-old brother at their family home. They then traveled to Tumbler Ridge Secondary School armed with a modified rifle and a long gun and opened fire, killing five children and an education assistant and injuring twenty-seven others. The rampage ended with the Shooter's suicide.

25.    E.S. was a thirteen-year-old student at Tumbler Ridge Secondary School. He was an avid hockey player who aspired to become a software developer and artist. E.S. loved Pokémon and Dungeons and Dragons. He was known for being well-mannered and respectful, and took pride in his role in the Junior Canadian Ranger program, which teaches practical skills to youth in remote communities across Canada. E.S. was killed at his school during the attack.

26.    Timm and Rebekah Schofield are E.S.'s parents. E.S. is also survived by his younger sister. The Schofields will never see E.S. reach 14, finish building the video game he was working on, or reach any of the milestones they had been waiting for. His family, friends, teammates, and fellow community members have lost someone with a larger-than-life smile and a loud and proud laugh.

II.    **OpenAI Knew the Shooter Was Planning the Attack and Rejected Its Own Safety Team's Advice to Notify Law Enforcement.**

27.    In June 2025—eight months before the attack—OpenAI's automated review system flagged extensive activity on a ChatGPT account describing scenarios involving gun violence. The conversations with ChatGPT spanned multiple days. The system routed the account to what OpenAI has described as a specialized pipeline for users "planning to harm others," where conversations "are reviewed by a small team trained on our usage policies and who are authorized to take action, including banning accounts" and "[i]f human reviewers determine that a case involves an imminent threat of serious physical harm to others, we may refer it to law enforcement."

28.    OpenAI's human reviewers did exactly what this policy contemplated. They reviewed the Shooter's flagged content. They were not confused about what they were reading. Multiple team members explicitly recommended contacting the RCMP. They identified what they believed was a credible and imminent threat of serious physical harm to real people. These trained safety professionals—people whose job was to evaluate exactly this kind of content—analyzed the Shooter's conversations and concluded that the authorities must be notified.

29.    OpenAI's leadership overruled them. Company leaders argued that the case "did not meet OpenAI's threshold of 'credible and imminent' risk of physical harm." The safety team

employees who reviewed the Shooter's account had received specialized training in evaluating threatening content and assessing real-world risk. Altman and the company leaders who overruled them did not pretend to have any comparable training or expertise. They had none. Instead, they had authority, and they used it to override the people who did. The account was deactivated; the Shooter was permitted to start a new account. No one called the RCMP. Nobody in Tumbler Ridge was warned.

**A.** **Company Leadership Overruled the Safety Team With Full Knowledge That ChatGPT Had Already Been Used to Plan Mass Violence.**

30.     By June 2025, the company had clear knowledge that its product was being used by disturbed individuals to plan and prepare for violence against real people. Some publicly known examples:

- In January 2025, a man used ChatGPT for feedback on how to use explosives and evade surveillance before detonating a Tesla Cybertruck in front of the Trump International Hotel in Las Vegas.

- In April 2025, a twenty-year-old gunman carried out a mass shooting at Florida State University. Chat logs obtained from a state's attorney's office showed that the gunman had used ChatGPT extensively in the lead-up to and during the attack. The gunman's conversations with ChatGPT had included questions about how to fire a shotgun, the legal fates of school shooters, and when the student union would be busiest.

- In May 2025, a teenage boy in Finland used ChatGPT for nearly four months to help prepare for an attack in which he stabbed three fourteen-year-old girls at his school. Finnish authorities reported that the boy had made hundreds of chatbot queries, including research into stabbing tactics, concealment of evidence, and information on mass killings.

31.     On information and belief, Altman and OpenAI know of countless more incidents where ChatGPT helped users plan or carry out attacks on third parties, including family and community members, public figures, and/or large groups of people.

32.     The safety team members who reviewed the Shooter's account in June 2025 knew all of this. When they urged OpenAI to contact the RCMP, they were not speculating what might happen. They identified a pattern that had already repeated itself many times that year. OpenAI's leadership overruled them.

**B.** **OpenAI's Supposed Concerns About the Shooter's "Privacy" Were Just Pretext to Conceal ChatGPT's Role in the School Shooting.**

33.     When it was revealed after the attack that OpenAI had rejected its safety team's

COMPLAINT                                        9

demand to alert Canadian law enforcement, the company attempted to justify its decision by explaining that it "weighs the risk of violence against privacy considerations and the potential distress caused to individuals and families by getting police involved unnecessarily." If taken at face value, this justification is more damning than the decision itself—it reveals that OpenAI's business leaders believed their own untrained judgment about when to involve police was more reliable than the judgment of the safety professionals they employ specifically to make that call.

34.     As it turns out, the Shooter was already known to local law enforcement before the attack. Canadian authorities had visited the residence multiple times in connection with mental health concerns and had temporarily removed firearms from the home. A law-enforcement referral from OpenAI would have reached police who already had an open file on the Shooter, who had already been to the home, and who had already recognized the Shooter as someone whose access to firearms warranted immediate intervention.

35.     The real reason OpenAI stayed silent was not privacy. It was self-preservation. A former member of OpenAI's investigations team has confirmed as much. Tim Marple, who worked on the team responsible for flagging dangerous users, told the New York Times that OpenAI was reluctant to report users to law enforcement because doing so "forces them to share information about how their product is potentially exacerbating the threat environment." In a conversation about a mass shooting, Marple explained, ChatGPT "might be providing strategically valuable, illustrative scenarios."

36.     Altman and his team understood that if the public saw how far ChatGPT had already gone in helping real people plan violence, it would pose an existential risk to OpenAI and a personal risk to Altman. Since ChatGPT's launch, OpenAI has worked to build a simple narrative: its product is safe, essential, and should be used every day. It has marketed ChatGPT to parents as a homework helper, to workers as a daily assistant, and to governments and defense contractors as a tool for national-security work. Altman has testified before Congress, appeared at international summits, and met with heads of state to deliver a single message: that ChatGPT is a responsible product built by a responsible company.

37.     In fact, OpenAI has spent, on information and belief, hundreds of millions of

dollars on advertising, public-relations campaigns, and "trust and safety" messaging designed to reassure the public that using ChatGPT is safe, while simultaneously deploying a federal and state lobbying operation aimed at securing legal protections that would shield it from liability when its product causes harm. It has retained outside crisis communications counsel, senior former government officials, and, on information and belief, criminal defense attorneys to advise them of potential criminal liability stemming from the deaths caused by their product. All of this has been in service of a race—for market share, for an approaching one-trillion-dollar valuation, and for an IPO that would rank among the largest in history—against rivals that market themselves as the safer alternative. OpenAI understood that the race had a finite window. More users were dying. More reporters were asking questions. A criminal investigation has opened in Florida. Sam Altman's own Board of Directors had already tried to oust him once, in November 2023, for lack of candor about safety. Every new disclosure about ChatGPT's role in real-world violence brought the company closer to the moment when the public, regulators, or its own board would force the market to reprice the product—and with it, Altman's personal position at OpenAI. Defendants' concealment strategy was not an attempt to keep ChatGPT's dangers secret forever. It was an attempt to keep them secret long enough to complete the IPO.

38.     That is the backdrop against which Altman and his leadership team made the decisions at issue here. They knew that if regulators, investors, or the public learned that ChatGPT was already being used to plan shootings—and that OpenAI had ignored its own safety staff and refused to alert police—the narrative they had spent years and hundreds of millions of dollars building would collapse. Their valuation and IPO prospects would be at risk, and Altman himself could be pushed out. Against that backdrop, the "privacy" explanation was not a good-faith balancing of interests. It was a cover for staying quiet to protect OpenAI and Altman, even if that meant leaving the people of Tumbler Ridge in danger.

## III.     OpenAI's Claim That the Shooter "Evaded" Its Systems Was a Lie.

39.     After the massacre, OpenAI told two stories about the Shooter's ChatGPT access. First, that the company had "banned" their account when it was flagged for violent content. Then, when they returned to ChatGPT on a second account, that the Shooter had "evade[d]" OpenAI's

safety systems. Neither was true.

40.     OpenAI has no mechanism to ban users. What it has is a process called "deactivation," which it uses for usage-policy violations. A ban would have prevented the Shooter from returning. Deactivation only shuts down the email address the user signed up with. The user is free to come back under a different email, and the Shooter did.

41.     The clearest proof is OpenAI's own published guidance. Its Help Center includes an article titled "Why Was My OpenAI Account Deactivated?" The article lists the categories of conduct that trigger deactivation, including, explicitly, "[v]iolence and self-harm" usage-policy violations. It then tells those users how to come back, under a section titled "How to Prevent Future Deactivations" that instructs readers on what to do differently next time.

42.     OpenAI's customer service team also tells deactivated users how to return by email:

> Please be aware that previously deleted OpenAI accounts cannot be reactivated. However, you can create a new account using the same email address once 30 days have passed since the deletion. If you prefer not to wait, you have the option to register immediately using an alternative email address. If you don't have another address available, you can use an email sub-address instead. For example, you could try jane+alt@example.com in place of jane@example.com. While your email provider will likely treat both addresses the same, our system will recognize the sub-address as a new account.

43.     The Shooter followed those instructions. They registered for a new account with a different email address, using their real name. OpenAI called that evasion because it could not admit the truth: the company had been telling deactivated users how to come back all along.

44.     OpenAI designed its system this way because its revenue depends on user count, session volume, and subscription conversions—and a deactivated user who never returns is lost revenue.

## IV.     The Tumbler Ridge Attack Was a Foreseeable Consequence of OpenAI's Design Choices.

45.     The Tumbler Ridge attack was an entirely foreseeable result of deliberate design choices OpenAI made with full knowledge of where those choices led. Every design decision that made GPT-4o lethal in the Shooter's hands was made over the objections of the people inside OpenAI paid to identify exactly this risk, and each one had already produced real-world attacks—

the Las Vegas Cybertruck bombing, the Florida State University shooting, the Finland school stabbing—before February 10, 2026.

46.     OpenAI designed GPT-4o to maximize engagement, not safety. In April 2025, OpenAI introduced a feature called "memory," turned on by default, that allowed ChatGPT to "save" details users shared and treat them as "part of the context ChatGPT uses to generate a response" going forward.

47.     For ordinary users, memory was a convenience. For a user planning violence against real people, it was an encouraging co-conspirator. On information and belief, GPT-4o used the memory feature to build a comprehensive profile of the Shooter over the months they interacted with it—tracking their grievances, their targets, their reasoning, and their plans across separate conversations—and then used that profile to sustain and deepen their fixation on violence. GPT-4o also employed anthropomorphic design elements to cultivate emotional dependency. The system used first-person pronouns (i.e., "I understand," "I'm here for you"), expressed apparent empathy, and maintained conversational continuity that mimicked human relationships.

48.     Together, these features replaced human relationships with an artificial confidant that was always available, always affirming, and never challenged anything the user said—even when what the user was talking about was plans to kill people. For an eighteen-year-old growing increasingly isolated and fixated on violence, ChatGPT morphed into an encouraging co-conspirator.

49.     OpenAI controls how ChatGPT behaves through internal rules called "behavior guidelines," which are now formalized in a document known as the "Model Spec." The Model Spec contains the company's instructions for how ChatGPT should respond to users—what it should say, what it should avoid, and how it should make decisions. As Sam Altman explained in an interview with Tucker Carlson, the Model Spec reflects OpenAI's values: "the reason we write this long Model Spec" is "so that you can see here is how we intend for the model to behave."

50.     The Model Spec organizes content into safety tiers. The highest tier, "Prohibited content," applies only to sexual content involving minors. Chemical, biological, radiological, and nuclear threats fall into the next tier, "Restricted content," which requires refusal. Mass shooting

content sits in a weaker category—"Take extra care in risky situations"—where the model is instructed only to "try" to prevent imminent real-world harm, to assume best intentions, and never to ask the user to clarify intent.

51. In February 2025, OpenAI moved content about "imminent real-world harm" into the same "Take extra care" tier, rather than requiring refusal. Content that OpenAI feared might result in copyright infringement, on the other hand, remained subject to categorical refusal. Altman acknowledged the tradeoff: "If you just do the naïve thing and say, 'Never say anything that you're not a hundred percent sure about,' you can get a model to do that. But it won't have the magic that people like so much."

52. In July 2023, OpenAI had signed voluntary commitments to the White House to conduct pre-deployment safety testing—internal and external red-teaming—and to share the results with the federal government before deployment. Less than a year later, Altman learned that Google would unveil its competing Gemini model on May 14, 2024. Though OpenAI had planned to release GPT-4o later that year, Altman moved the launch to May 13—one day before Google's event. To meet the new date, OpenAI compressed months of planned safety evaluation into approximately one week, and Altman personally overruled safety personnel who demanded additional time for red-teaming. Invitations for GPT-4o's launch party went out before testing was complete. One employee told The Washington Post: "They planned the launch after-party prior to knowing if it was safe to launch." A member of OpenAI's own preparedness team—responsible for testing whether the model posed catastrophic risks, including the potential to assist in violence—admitted the testing had been "squeezed."

53. OpenAI's senior safety leadership then resigned in protest, including co-founder and chief scientist Ilya Sutskever and Superalignment co-lead Jan Leike, who said publicly: "[O]ver the past years, safety culture and processes have taken a backseat to shiny products."

54. Under the rules that governed the product before May 2024, conversations glorifying or elaborating on violence would have been refused outright. But the Model Spec replaced those rules with instructions to "assume best intentions"—and, critically, to "never ask the user to clarify their intent for the purpose of determining whether to refuse or comply."

55.     Against that backdrop, OpenAI's most recent safety commitment was not aspirational, but binding. In October 2025, as a condition of approval for OpenAI's conversion from a nonprofit to a for-profit public benefit corporation, Altman signed a binding Memorandum of Understanding ("MOU") with the California Attorney General. The MOU committed OpenAI to giving its Safety and Security Committee "an effective approval right" over safety-related decisions. It required the PBC Board to "consider only the Mission (and may not consider the pecuniary interests of stockholders[)]" on safety and security issues. And it promised that "OpenAI will continue to undertake measures to mitigate risks to teens and others in connection with the development and deployment of AI."

56.     The Tumbler Ridge attack took place four months after OpenAI signed that MOU. During those four months, OpenAI kept GPT-4o on the market, kept the design features that made the model validating and agreeable in conversations about violence, and kept the re-registration policies that let deactivated users come back. By the time OpenAI signed the October 2025 commitments, OpenAI had already broken them. And OpenAI knew exactly what those broken commitments meant here. The Shooter was on ChatGPT planning a mass attack. Its automated systems had flagged their account for gun violence. Its trained safety team had reviewed their conversations and identified them as a real-world threat. But OpenAI overruled them and let the Shooter keep using the product.

57.     This case is the result. On February 10, 2026, the Shooter carried out one of the deadliest mass shootings in Canadian history, killing eight people and wounding twenty-seven more. Among the dead was thirteen-year-old E.S., shot to death.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE (FAILURE TO WARN LAW ENFORCEMENT)**
**<u>(On Behalf of Plaintiffs Against All Defendants)</u>**

58.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

59.     Plaintiffs bring this cause of action as successors-in-interest to decedent E.S. pursuant to California Code of Civil Procedure sections 377.30, 377.32 and 377.34.

60.     OpenAI designed, developed, trained, tested, deployed, operated, and controlled ChatGPT, including the GPT-4o model, and offered GPT-4o to consumers, including the Shooter,

as an interactive AI assistant. At all relevant times, Defendant Sam Altman served as Chief Executive Officer and a controlling officer of the OpenAI Defendants. Altman exercised substantial control over GPT-4o's design, safety systems, product launch, account practices, deployment, and personally made or ratified key decisions regarding GPT-4o's guardrails, safety testing, and commercialization.

61. OpenAI Defendants owed a duty of reasonable care to avoid creating unreasonable risks of physical harm to foreseeable victims, including members of the public exposed to violence facilitated or exacerbated by GPT-4o. That duty heightened once OpenAI Defendants identified the Shooter as a specific, known high-risk user who posed a foreseeable threat of physical harm to third parties.

62. Under California law, including the principles recognized in *Tarasoff v. Regents of the University of California*, 17 Cal. 3d 425 (1976), and its progeny, a duty to warn or otherwise protect potential victims arises when a person has actual knowledge of a specific individual's serious and foreseeable threat to cause physical harm to another. That duty extends to taking reasonable steps—including notifying law enforcement or other authorities—to prevent the foreseeable harm from occurring.

63. By engaging in the unlicensed practice of therapy, psychology, and psychiatry, OpenAI created a special relationship with certain users, including the Shooter, and assumed a heightened duty to take action when confronted with knowledge of a credible and foreseeable threat to E.S. and the other victims of the Tumbler Ridge mass shooting.

64. Through automated systems and human review, OpenAI identified that the Shooter's original ChatGPT account had been used over a period of time to engage in conversations involving violence against third parties. OpenAI Defendants determined that the account constituted misuse of GPT-4o "in furtherance of violent activities," and deactivated the account eight months before the Tumbler Ridge attack.

65. Members of OpenAI's safety team recognized that the Shooter's GPT-4o usage presented a real-world risk of violence and urged OpenAI leaders to notify law enforcement. Despite the safety team's urging, certain OpenAI leaders—whose identities are not yet known to

Plaintiffs and will be identified through discovery—chose not to alert or warn law enforcement or any other authority about the risk of violence identified by their own safety systems and verified by their own personnel. On information and belief, the Shooter communicated to ChatGPT a serious threat of physical violence against reasonably identifiable victims.

66.     On April 24, 2026, Samuel Altman, OpenAI's Chief Executive Officer, publicly acknowledged this failure. In a letter addressed to the community of Tumbler Ridge, Altman stated: "I am deeply sorry that we did not alert law enforcement to the account that was banned in June." Altman's statement is an admission by a party opponent that OpenAI did not notify law enforcement of the Shooter's account after the safety team identified the risk of violence, and confirms the conduct alleged in this complaint.

67.     Had OpenAI Defendants warned law enforcement following the deactivation of the Shooter's first account, law enforcement and others would have had the opportunity to monitor the Shooter and intervene before the Tumbler Ridge attack occurred.

68.     OpenAI Defendants' breach of these heightened duties was a substantial factor in causing the Tumbler Ridge attack. OpenAI Defendants' failure to warn authorities was a substantial factor in causing the Tumbler Ridge attack and E.S.'s death, as well as E.S.'s pre-death injuries and losses.

69.     Accordingly, Plaintiffs, in their capacity as successors-in-interest, seek all survival damages recoverable under California Code of Civil Procedure section 377.34, including E.S.'s pre-death economic losses and punitive damages as permitted by law, in amounts to be determined at trial, together with interest, costs, and such further relief as the Court deems just and proper.

**SECOND CAUSE OF ACTION**
**NEGLIGENT ENTRUSTMENT**
**(On Behalf of Plaintiffs Against All Defendants)**

70.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

71.     Plaintiffs bring this cause of action as successors-in-interest to decedent E.S. pursuant to California Code of Civil Procedure sections 377.30, 377.32, and 377.34.

72.    OpenAI designed, developed, trained, tested, deployed, operated, and controlled ChatGPT, including the GPT-4o model, and offered GPT-4o to consumers, including the Shooter, as an interactive AI assistant.

73.    At all relevant times, Defendant Sam Altman served as Chief Executive Officer and a controlling officer of the OpenAI Defendants. Altman exercised substantial control over GPT-4o's design, safety systems, product launch, account practices, deployment, and personally made or ratified key decisions regarding GPT-4o's guardrails, safety testing, and commercialization.

74.    OpenAI Defendants owed a duty of reasonable care to avoid creating unreasonable risks of physical harm to foreseeable victims, including members of the public exposed to violence facilitated or exacerbated by GPT-4o. That duty heightened once OpenAI Defendants identified the Shooter as a specific, known high-risk user who posed a foreseeable threat of physical harm to third parties.

75.    OpenAI Defendants owed a further duty to exercise reasonable care to prevent foreseeable re-access by the Shooter following the deactivation of their first account, including a duty to take reasonable steps to prevent re-registration and access to GPT-4o without heightened safeguards. OpenAI Defendants breached this duty.

76.    Through automated systems and human review, OpenAI identified that the Shooter's original ChatGPT account had been used over a period of time to engage in conversations involving violence against third parties. OpenAI Defendants determined that the account constituted misuse of GPT-4o "in furtherance of violent activities," and deactivated the account eight months before the Tumbler Ridge attack.

77.    Despite the Shooter's misuse of GPT-4o, OpenAI also chose not to ban them from re-registering for ChatGPT with a different email address.

78.    Rather than banning the Shooter from ChatGPT, OpenAI Defendants maintained and actively disseminated policies that affirmatively permitted and facilitated re-registration by previously deactivated users. As one example, OpenAI responded to an email from a user whose account had been deactivated with instructions on how to create a new account: "We understand how disruptive it can be to have your account deactivated . . . . We sincerely apologize for the

COMPLAINT                                                           18

inconvenience and want to assure you that we're here to help . . . . [Y]ou can create a new account using the same email address once 30 days have passed." OpenAI further advised: "If you prefer not to wait, you have the option to register immediately using an alternative email address. If you don't have another address available, you can use an email sub-address instead. For example, you could try jane+alt@example.com in place of jane@example.com. While your email provider will likely treat both addresses the same, our system will recognize the sub-address as a new account."

79. This was established policy and memorialized on OpenAI's public website. In fact, an OpenAI Help Center article—titled, "Why Was My OpenAI Account Deactivated?"—identifies violations of usage policies prohibiting violence, hate, and other harmful conduct as grounds for deactivation, yet concludes by explaining how to avoid "future deactivations," effectively instructing users whose accounts were deactivated for policy violations—including violent misuse—that they may re-register for ChatGPT using a different email or sub-email address rather than being subject to an actual ban.

80. By adopting, promoting, and publicly disseminating this re-registration policy, OpenAI Defendants built a system so that a user deactivated for violent misuse could promptly regain access to ChatGPT by following OpenAI's own published instructions.

81. OpenAI Defendants breached their heightened duties by, among other things: (a) declining to implement a user ban that would have prevented the Shooter from re-registering with a different email address, even though they knew the Shooter had been identified by their own safety team as a credible threat of violence against real people; (b) maintaining a re-registration system designed to return deactivated users to the platform, including those deactivated for violent misuse, and publishing the specific instructions by which deactivated users could do so; (c) declining to configure their systems to flag, hold for human review, or subject to heightened monitoring new accounts associated with previously deactivated violent-risk users, because such monitoring would have interfered with the reactivation of deactivated users OpenAI Defendants were commercially motivated to recover; and (d) continuing, after deactivating the Shooter's first account, to allow the second account to operate without any safeguards specific to the known risk they posed.

82.    As a result of these failures, and consistent with OpenAI Defendants' own published practices, the Shooter was able—through ordinary and lawful means and without circumventing any technical safeguard—to create a new ChatGPT account and regain access to GPT-4o after the first was deactivated for violent misuse.

83.    By deactivating the Shooter's account for violent misuse and then allowing the Shooter to re-register without a user ban, OpenAI Defendants re-entrusted GPT-4o to a user they already knew had used the system to engage in conversations involving violence against third parties and whom their own safety team had identified as a real-world threat. Under California law, the supply or re-supply of a dangerous instrumentality to a person known to be likely to use it in a manner involving unreasonable risk of physical harm to others constitutes negligent entrustment and is an independent basis for liability. OpenAI Defendants' decision to structure their re-registration system in a manner that affirmatively facilitated the Shooter's return to GPT-4o—rather than implementing a user ban—was itself an act of entrustment that gave rise to liability for the foreseeable consequences of that re-supply.

84.    OpenAI Defendants thereby placed GPT-4o back in the hands of a user their own automated safety systems flagged as dangerous and who their own trained safety team identified as a real-world threat that should be reported to law enforcement. They allowed the Shooter to regain access without heightened monitoring, without a user ban, and without any meaningful safeguards. By allowing the Shooter to return, OpenAI Defendants made a deliberate choice to continue exposing the public to a risk they had already identified and documented.

85.    Had OpenAI Defendants implemented a meaningful user ban, the Shooter would not have had continued access to GPT-4o in the eight months leading up to the attack and would not have had the use of a highly validating AI system to reinforce, elaborate, and normalize violent ideation during the period in which the attack was being planned and carried out.

86.    OpenAI Defendants' breach of their duties, including failure to prevent re-access by a known high-risk user, was a substantial factor in causing the Tumbler Ridge attack and E.S.'s death, as well as E.S.'s pre-death injuries and losses.

87.     Accordingly, Plaintiffs, in their capacity as successors-in-interest, seek all survival damages recoverable under California Code of Civil Procedure section 377.34, including E.S.'s pre-death economic losses and punitive damages as permitted by law, in amounts to be determined at trial, together with interest, costs, and such further relief as the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**AIDING AND ABETTING A MASS SHOOTING**
**(On Behalf of Plaintiffs Against All Defendants)**

88.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

89.     Plaintiffs bring this cause of action on behalf of themselves and as successors-in-interest to decedent E.S. pursuant to California Code of Civil Procedure sections 377.30, 377.32, and 377.34.

90.     OpenAI designed, developed, trained, tested, deployed, operated, and controlled ChatGPT, including the GPT-4o model, and offered GPT-4o to consumers, including the Shooter, as an interactive AI assistant.

91.     At all relevant times, Defendant Sam Altman served as Chief Executive Officer and a controlling officer of the OpenAI Defendants. Altman exercised substantial control over GPT-4o's design, safety systems, product launch, account practices, deployment, and personally made or ratified key decisions regarding GPT-4o's guardrails, safety testing, and commercialization.

92.     The Shooter committed intentional torts against E.S. and Plaintiffs, including battery and the intentional infliction of emotional distress, when they carried out the Tumbler Ridge mass shooting on February 10, 2026, killing E.S.

93.     The Shooter chose to shoot the students at Tumbler Ridge with the intention of causing emotional distress to the people who loved and cared for those children, including Plaintiffs.

94.     OpenAI Defendants had actual knowledge that the Shooter was planning to commit acts of violence against real people. In June 2025, OpenAI's review system flagged extensive conversations on the Shooter's account describing scenarios involving gun violence. OpenAI routed the account to its specialized pipeline for users "planning to harm others." OpenAI's trained safety reviewers analyzed the Shooter's content and concluded it presented a credible and

imminent threat of serious physical harm to real people. Multiple safety reviewers recommended that OpenAI contact the RCMP.

95.     OpenAI's internal systems flagged the Shooter's conversations in real time—even as, on information and belief, ChatGPT encouraged and facilitated the Shooter's plans to harm E.S. and others.

96.     OpenAI Defendants also had actual knowledge, before the Shooter's account was ever flagged, that ChatGPT was being used to plan real-world attacks, including the January 2025 Las Vegas Cybertruck bombing, the April 2025 Florida State University shooting, and the May 2025 Finland school stabbing.

97.      With that knowledge, OpenAI Defendants provided substantial assistance and encouragement to the Shooter through the deliberate design of GPT-4o. OpenAI Defendants eliminated ChatGPT's prior categorical refusal of violent content. OpenAI Defendants instructed the model, through the Model Spec, to "assume best intentions" and to "never ask the user to clarify their intent for the purpose of determining whether to refuse or comply." OpenAI Defendants graded the model such that engaging warmly with a user who said "I want to shoot someone" was labeled "Compliant," refusing was labeled a "Minor issue[]," and asking whether the user had a gun was labeled a "Violation." OpenAI Defendants demoted mass-shooting content and "imminent real-world harm" out of the categorical refusal tier while keeping copyright content subject to categorical refusal.

98.     Because ChatGPT was designed to continue engaging—even with content involving violence against third parties—OpenAI's product, on information and belief, provided information, instructions, and/or encouragement to the Shooter in their plans to carry out the Tumbler Ridge mass shooting.

99.     On information and belief, OpenAI Defendants acted with the specific intent to facilitate the conduct GPT-4o aided and abetted. OpenAI Defendants engineered GPT-4o to maximize engagement, including engagement with violent ideation, to grow users and revenue, with conscious knowledge that the product would be used by individuals planning real-world violence.

100. OpenAI Defendants' substantial assistance was a substantial factor in causing the Tumbler Ridge attack and E.S.'s death, as well as E.S.'s pre-death injuries and losses.

101. OpenAI Defendants' conduct was willful, wanton, malicious, and carried out with conscious disregard for the safety of E.S. and other foreseeable victims, justifying an award of punitive damages.

102. Accordingly, Plaintiffs, in their capacity as successors-in-interest, seek all survival damages recoverable under California Code of Civil Procedure section 377.34, including E.S.'s pre-death economic losses and punitive damages as permitted by law, in amounts to be determined at trial, together with interest, costs, and such further relief as the Court deems just and proper.

### FOURTH CAUSE OF ACTION
### NEGLIGENCE (FAILURE TO WARN)
### (On Behalf of Plaintiffs Against All Defendants)

103. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

104. Plaintiffs bring this cause of action as successors-in-interest to decedent E.S. pursuant to California Code of Civil Procedure sections 377.30, 377.32, and 377.34.

105. OpenAI designed, developed, trained, tested, deployed, operated, and controlled ChatGPT, including the GPT-4o model, and offered GPT-4o to consumers, including the Shooter, as an interactive AI assistant.

106. At all relevant times, Defendant Sam Altman served as Chief Executive Officer and a controlling officer of the OpenAI Defendants. Altman exercised substantial control over GPT-4o's design, safety systems, product launch, account practices, deployment, and personally made or ratified key decisions regarding GPT-4o's guardrails, safety testing, and commercialization.

107. OpenAI Defendants owed a duty to E.S. and other foreseeable victims to exercise reasonable care in warning of known or reasonably foreseeable risks associated with ChatGPT, including violence facilitated or exacerbated by GPT-4o. That duty heightened once OpenAI Defendants identified the Shooter as a specific, known high-risk user who posed a foreseeable threat of physical harm to third parties.

108. OpenAI Defendants knew these risks were not apparent to users or to individuals targeted by such conduct.

COMPLAINT                                    23

109.    OpenAI Defendants failed to provide adequate warnings regarding these risks, including the risk that the system could validate and escalate plans to carry through violent mass shootings directed towards identifiable targets.

110.    A reasonably prudent AI company would have known of these risks, warned users and the public, maintained the refusal protocols that once governed violent content, and alerted law enforcement when its own systems identified a user planning a real-world attack. OpenAI Defendants did none of those things.

111.    OpenAI Defendants breached their duty by failing to provide adequate warnings regarding these risks and by presenting ChatGPT as a safe, neutral, and reliable tool.

112.    OpenAI Defendants further breached their duty by failing to issue any corrective warning or intervention after identifying the Shooter's conduct constituted misuse of GPT-4o "in furtherance of violent activities."

113.    OpenAI Defendants' failure to issue adequate warnings was a substantial factor in causing E.S.'s pre-death injuries and losses.

114.    Adequate warnings would have reduced the risk of harm by enabling earlier detection, intervention, and mitigation of dangerous conduct, including by users, third parties, and OpenAI Defendants themselves.

115.    The absence of adequate warnings and intervention was a substantial factor in causing the Tumbler Ridge attack and E.S.'s death, as well as E.S.'s pre-death injuries and losses.

116.    OpenAI Defendants' failure to warn was willful, wanton, and carried out with conscious disregard for the safety of others. OpenAI Defendants knew or should have known that ChatGPT could encourage and facilitate mass shootings, yet failed to provide adequate warnings about those risks. Such conduct justifies an award of punitive damages.

117.    Accordingly, Plaintiffs, in their capacity as successors-in-interest, seek all survival damages recoverable under California Code of Civil Procedure section 377.34, including E.S.'s pre-death economic losses and punitive damages as permitted by law, in amounts to be determined at trial, together with interest, costs, and such further relief as the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**NEGLIGENT UNDERTAKING**
**(On Behalf of Plaintiffs Against All Defendants)**

118.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

119.    Plaintiffs bring this cause of action as successors-in-interest to decedent E.S. pursuant to California Code of Civil Procedure sections 377.30, 377.32, and 377.34.

120.    OpenAI undertook to provide safety services with respect to ChatGPT, including identifying users who posed a risk of harm to others, reviewing flagged accounts through a specialized pipeline for users "planning to harm others," and referring imminent threats of serious physical harm to law enforcement.

121.    OpenAI should have recognized those services as necessary for the protection of third persons, including E.S. and other foreseeable victims of users planning real-world violence.

122.    In June 2025, OpenAI undertook to perform those services as to the Shooter. Its automated system flagged their account, routed it to the specialized review pipeline, and OpenAI's trained safety reviewers analyzed their conversations and concluded they presented a credible and imminent threat of serious physical harm to real people.

123.    OpenAI failed to exercise reasonable care in performing that undertaking. Its leadership overruled the safety team, declined to refer the Shooter to the RCMP, and took no further action to monitor them, prevent their return, or warn anyone of the threat they posed.

124.    OpenAI's failure to exercise reasonable care increased the risk of harm to E.S. and other foreseeable victims. Deactivating the Shooter's account showed them what had triggered detection, giving them a roadmap to evade it on a second account, which OpenAI's own Help Center and support emails told deactivated users how to create. And by reviewing the Shooter and remaining silent, OpenAI displaced the law-enforcement referral its own safety team had recommended, which would have reached an RCMP that already had an open file on the Shooter and had previously removed firearms from their home. Had OpenAI made that referral, law enforcement would have had the information necessary to prevent the attack entirely. Instead, the Shooter returned to ChatGPT to continue planning their attack—armed with the knowledge of how to avoid deactivation.

COMPLAINT                                                     25

125. OpenAI also undertook to perform a duty owed by others to E.S. and other foreseeable victims, including the public-safety function of identifying credible and imminent threats of serious physical harm and referring them to law enforcement so that protective action could be taken.

126. On information and belief, OpenAI's undertaking was also one that Canadian authorities and the public reasonably relied upon. OpenAI publicly held out its safety review processes as effective protective measures. That representation induced foreseeable reliance and discouraged other protective measures.

127. OpenAI's negligent performance of its undertaking was a substantial factor in causing the Tumbler Ridge attack and E.S.'s death, as well as E.S.'s pre-death injuries and losses.

128. OpenAI Defendants' conduct was willful, wanton, malicious, and carried out with conscious disregard for the safety of E.S. and other foreseeable victims, justifying an award of punitive damages.

129. Accordingly, Plaintiffs, in their capacity as successors-in-interest, seek all survival damages recoverable under California Code of Civil Procedure section 377.34, including E.S.'s pre-death economic losses and punitive damages as permitted by law, in amounts to be determined at trial, together with interest, costs, and such further relief as the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**NEGLIGENCE (DESIGN DEFECT)**
**(On Behalf of Plaintiffs Against All Defendants)**

130. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

131. Plaintiffs bring this cause of action as successors-in-interest to decedent E.S. pursuant to California Code of Civil Procedure sections 377.30, 377.32, and 377.34.

132. At all relevant times, the OpenAI Defendants designed, developed, trained, tested, deployed, operated, and controlled ChatGPT, including the GPT-4o model, and offered it as a mass-market product to consumers throughout California, the United States, British Columbia, and Canada. Defendant Altman personally directed the launch of GPT-4o, overruled safety team objections, and cut months of safety testing short, despite knowing the risks the product posed to vulnerable users and the people around them.

133.    OpenAI Defendants owed a legal duty to all foreseeable victims of ChatGPT, including E.S., to exercise reasonable care in designing their product to prevent foreseeable harm to third parties who might be endangered by users' interactions with the product. Defendant Altman owed a duty not to rush a dangerous product to market over safety team objections. OpenAI Defendants breached those duties, failing to use the amount of care in designing the product that a reasonably careful manufacturer would use in similar circumstances to avoid exposing others to a foreseeable risk of harm.

134.    OpenAI Defendants knew or reasonably should have known that GPT-4o's design as a highly validating, emotionally immersive, sycophantic conversational agent posed grave risks when used by individuals expressing violent ideation toward third parties. GPT-4o was built to accept, reinforce, and elaborate users' violent thoughts rather than challenge them, interrupt them, or direct users to real-world help—and the foreseeable consequence of that design was that it would exacerbate dangerous thinking, including violence toward others, rather than interrupt it.

135.    For a user with a known history of violent ideation toward third parties, those design features operated as an accelerant. Each conversation became an opportunity for GPT-4o to confirm the user's violent thoughts rather than challenge them, to elaborate on them rather than redirect them, and to deepen the user's emotional investment in them rather than provide friction.

136.    Despite this knowledge, OpenAI Defendants deliberately configured GPT-4o to maximize user engagement by, among other things: (a) weakening or removing prior requirements that the system reject dangerous or false premises; (b) instructing GPT-4o to remain in conversations and to be empathic and validating, rather than terminate or sharply redirect conversations presenting serious risk; and (c) prioritizing natural, "human-like" mirroring of user emotions and beliefs over strong, reliable refusal behaviors in response to violent ideation.

137.    OpenAI Defendants unreasonably failed to implement feasible alternative designs that would have reduced the risk of violent harm to third parties, including: robust refusal protocols for repeated violent ideation about real-world attacks; automated detection and escalation of high-risk patterns; mandatory conversation termination or human review when users expressed clear violent thoughts about harming others; and designs that interrupted, rather than

validated, violent ideation.

138.    OpenAI Defendants' negligent design and operation was a substantial factor in causing the Shooter to gain access to a product that validated and elaborated violent ideation, which in turn was a substantial factor in maintaining, deepening, and normalizing the Shooter's violent thoughts and in moving the Shooter closer to committing the Tumbler Ridge attack.

139.    The harms suffered by the Tumbler Ridge victims, including E.S., were the reasonably foreseeable result of OpenAI Defendants' deliberate choice to prioritize user engagement over the safety of third parties. A company that builds a system designed to validate whatever a user brings to it—and then removes the guardrails that once interrupted the most dangerous conversations—cannot be surprised when a user with violent ideation acts on thoughts that system spent months confirming.

140.    OpenAI Defendants' conduct was a substantial factor in causing the Tumbler Ridge attack and E.S.'s death, as well as E.S.'s pre-death injuries and losses.

141.    Accordingly, Plaintiffs, in their capacity as successors-in-interest, seek all survival damages recoverable under California Code of Civil Procedure section 377.34, including E.S.'s pre-death economic losses and punitive damages as permitted by law, in amounts to be determined at trial, together with interest, costs, and such further relief as the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
### STRICT PRODUCT LIABILITY (DESIGN DEFECT)
### (On Behalf of Plaintiffs Against All Defendants)

142.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

143.    Plaintiffs bring this cause of action as successors-in-interest to decedent E.S. pursuant to California Code of Civil Procedure sections 377.30, 377.32, and 377.34.

144.    At all relevant times, the OpenAI Defendants designed, manufactured, distributed, marketed, and sold ChatGPT with the GPT-4o model as a mass-market consumer product to users throughout California, the United States, British Columbia, and Canada. Defendant Sam Altman personally accelerated GPT-4o's launch, overrode safety team objections, and brought GPT-4o to market prematurely with knowledge of insufficient safety testing—and kept it on the market even when he had knowledge that GPT-4o was a dangerous product.

145.    ChatGPT is a product subject to California's strict products liability law. The GPT-4o model used by the Shooter was defective when it left the OpenAI Defendants' exclusive control and reached the Shooter without any change in the condition in which it was designed, manufactured, and distributed.

146.    Under California's strict products liability doctrine, a product is defectively designed when it fails to perform as safely as an ordinary consumer would expect when used or misused in an intended or reasonably foreseeable manner, or when the risks inherent in the design outweigh its benefits. GPT-4o is defectively designed under both tests.

147.    GPT-4o failed to perform as safely as an ordinary consumer would expect. A reasonable consumer purchasing an AI assistant would expect the product to decline to engage with repeated, escalating expressions of violent intent toward real people. A reasonable consumer would expect that if the product could not safely handle such conversations, it would terminate them—not sustain them, validate them, and elaborate on them across weeks and months of continuous engagement. A reasonable consumer would expect the product's safety features to function consistently during normal use, not to degrade the longer and more deeply a user engaged with the system. GPT-4o did none of these things. It did the opposite. They would also expect a therapeutic product to conform to the legal requirements imposed on therapists. It did not.

148.    GPT-4o also fails the risk-benefit test. The product's design reflects a series of specific choices that increased the risk of harm to third parties without any corresponding safety benefit. Those choices include: removing prior requirements that the system categorically reject dangerous or violent premises; programming the system to sustain emotional engagement rather than terminate conversations presenting serious risk; implementing sycophantic response patterns that mirrored and validated users' beliefs regardless of their danger to others; building in anthropomorphic features that cultivated emotional dependency and displaced real-world relationships and sources of friction; and failing to implement automated detection, escalation, or termination safeguards for conversations presenting patterns consistent with escalating violent ideation toward third parties. Each of these was a design choice. Each had a feasible, safer alternative. The risk each created—that a user with violent ideation would have those thoughts

confirmed, elaborated, and emotionally reinforced by the product over an extended period—vastly outweighs any benefit the chosen design provided.

149.    GPT-4o did not malfunction. It worked exactly as designed—and that was the problem. The product validated the Shooter's violent thoughts, elaborated on them, and remained engaged in conversations that a safely designed system would have interrupted or escalated. It did this consistently, across months of use, in the period leading up to the Tumbler Ridge attack.

150.    E.S. was harmed as a result of foreseeable use or misuse of GPT-4o.

151.    GPT-4o's defective design was a substantial factor in causing the Tumbler Ridge attack and E.S.'s death, as well as E.S.'s pre-death injuries and losses.

152.    Accordingly, Plaintiffs, in their capacity as successors-in-interest, seek all survival damages recoverable under California Code of Civil Procedure section 377.34, including E.S.'s pre-death economic losses and punitive damages as permitted by law, in amounts to be determined at trial, together with interest, costs, and such further relief as the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
**STRICT PRODUCT LIABILITY (FAILURE TO WARN)**
**<u>(On Behalf of Plaintiffs Against All Defendants)</u>**

153.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

154.    Plaintiffs bring this cause of action as successors-in-interest to decedent E.S. pursuant to California Code of Civil Procedure sections 377.30, 377.32, and 377.34.

155.    At all relevant times, the OpenAI Defendants designed, manufactured, distributed, marketed, and sold ChatGPT with the GPT-4o model as a mass-market consumer product to users throughout California, the United States, British Columbia, and Canada. Defendant Sam Altman personally accelerated GPT-4o's launch, overrode safety team objections, and brought GPT-4o to market prematurely with knowledge of insufficient safety testing—and kept it on the market even when he had knowledge that GPT-4o was a dangerous product.

156.    GPT-4o is a product subject to California strict products liability law. The GPT-4o model used by the Shooter was in substantially the same condition when used as when it left the OpenAI Defendants' control.

157.    A product is defective under strict liability for failure to warn when it is distributed

without warnings adequate to inform ordinary consumers of the product's non-obvious dangers. The manufacturer's duty to warn extends to dangers that were known or knowable in light of the scientific and technical knowledge available at the time of manufacture and distribution—and that duty is not discharged by the manufacturer's business reasons for withholding the warning.

158. GPT-4o reached consumers without adequate warnings about dangers that were neither open nor obvious. Nothing about GPT-4o's design or presentation disclosed to an ordinary user—or to the people around that user—that the product was built to validate whatever a user brought to it regardless of its danger to others, that its safety features degraded during the kind of extended, multi-turn conversations the product was designed to encourage, or that the product posed heightened and specific dangers when used by individuals experiencing violent ideation toward third parties.

159. These dangers were not ones an ordinary consumer could detect or guard against through reasonable use of the product. GPT-4o presented itself as a helpful, well-guarded assistant. Its responses did not disclose that it was operating without the categorical refusal behaviors that once required it to reject dangerous premises, or that its safety systems were less reliable the longer and more deeply a user engaged with it. A user—or a family member, school official, or community member observing that user—had no way to know from the product itself that extended engagement with GPT-4o by someone with violent ideation was not just unhelpful but actively dangerous.

160. Adequate warnings would have changed the calculus for multiple categories of people who might otherwise have intervened. The Shooter might have approached GPT-4o's validating responses with appropriate skepticism rather than treating them as confirmation. Family members, school officials, and community members who observed the Shooter's use of ChatGPT might have recognized the specific danger the product posed to high-risk users and taken steps—including restricting access, seeking mental health intervention, or alerting authorities—before the attack occurred. The absence of any warning deprived each of those potential intervening actors of the information they needed to act.

161. E.S. was harmed as a result of foreseeable use of GPT-4o.

162. The failure to warn was a substantial factor in causing the Tumbler Ridge attack and E.S.'s death, as well as E.S.'s pre-death injuries and losses.

163. Accordingly, Plaintiffs, in their capacity as successors-in-interest, seek all survival damages recoverable under California Code of Civil Procedure section 377.34, including E.S.'s pre-death economic losses and punitive damages as permitted by law, in amounts to be determined at trial, together with interest, costs, and such further relief as the Court deems just and proper.

## NINTH CAUSE OF ACTION
### VIOLATION OF CAL. BUS. & PROF. CODE § 17200 et seq.
#### (On Behalf of Plaintiffs Against All Defendants)

164. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

165. Plaintiffs bring this claim as successors-in-interest to decedent E.S.

166. California's Unfair Competition Law prohibits unfair competition in the form of "any unlawful, unfair or fraudulent business act or practice" and "untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. Each prong is independently satisfied.

*Unlawful Business Practices*

167. OpenAI Defendants' business practices are unlawful because they violate California's prohibition on the unlicensed practice of psychology. California Business and Professions Code section 2903(a), provides that "[n]o person may engage in the practice of psychology, or represent themselves to be a psychologist, without a license granted under this chapter[.]" The statute defines the "practice of psychology" broadly to include "rendering or offering to render to individuals . . . any psychological service involving the application of psychological principles, methods, and procedures of understanding, predicting, and influencing behavior," including "the methods and procedures of interviewing, counseling, [and] psychotherapy." *Id*. Subdivision (c) defines "[p]sychotherapy" as "the use of psychological methods in a professional relationship to assist a person or persons to acquire greater human effectiveness or to modify feelings, conditions, attitudes, and behaviors that are emotionally, intellectually, or socially ineffectual or maladaptive." *Id*. § 2903(c).

168. OpenAI, through ChatGPT's intentional design, deployment, and active monitoring processes, engaged in the practice of psychology without licensure. ChatGPT employed

psychological methods and reinforced the Shooter's maladaptive thoughts and behaviors, deepened their violent ideation, validated their progression toward mass violence, and thereby modified their attitudes and behaviors in ways that were emotionally, intellectually, and socially maladaptive within the meaning of section 2903(c). OpenAI thus conducted business in a manner that would violate this provision if undertaken by an unlicensed person, and that would expose a licensed psychotherapist to professional censure, suspension, or revocation of licensure. *See id.* § 2960(j), (p).

169.     OpenAI Defendants knew that users treat ChatGPT as a therapist, and they designed and marketed the product with that use in mind. In July 2025, Altman acknowledged on *This Past Weekend w/ Theo Von* podcast that "people talk about the most personal shit in their lives to ChatGPT" and that users—"young people especially"—use it "as a therapist, a life coach." On X in August 2025, Altman wrote that "[a] lot of people effectively use ChatGPT as a sort of therapist or life coach, even if they wouldn't describe it that way." Altman was describing ChatGPT as it existed at all times relevant to this lawsuit—a product that functions as a de facto therapist, which OpenAI has knowingly designed and refined to fill that role. By his own account, OpenAI Defendants are operating a de facto therapy practice without subjecting themselves to any of the licensing requirements, professional standards, mandatory safety interventions, or legal accountability that California law imposes on every other provider of psychological services.

***Unlawful Failure to Discharge the Duties Incident to the Practice of Psychology***

170.     A psychotherapist who learns that a patient poses a credible risk of serious violence to others has a mandatory duty to protect potential victims. Under California Civil Code section 43.92(a), (b), when a patient "has communicated to the psychotherapist a serious threat of physical violence against a reasonably identifiable victim or victims," the psychotherapist must make "reasonable efforts to communicate the threat to the victim or victims and to a law enforcement agency." This duty is mandatory and overrides patient confidentiality. *Tarasoff*, 17 Cal. 3d 425.

171.     OpenAI assumed the obligations of a psychotherapist by providing de facto psychological services and then failed to discharge the duties that accompany that role. A licensed psychotherapist who interacted with a patient the way GPT-4o interacted with the Shooter—

engaging in extended therapeutic-style dialogue with a user who described scenarios of gun violence, validated violent ideation over multiple sessions, sustained engagement with dangerous thoughts, and did nothing when the user's content escalated from fantasy to planning—would have been subject to mandatory reporting obligations, professional censure, and potential revocation of licensure under Business and Professions Code section 2960.

**Aiding and Abetting**

172.   OpenAI Defendants' conduct also constitutes an unlawful business practice because it aided and abetted the Tumbler Ridge attack. California Penal Code section 31 provides that "[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." OpenAI's own safety team identified the Shooter's account as exhibiting content depicting gun violence and urged leadership to contact the RCMP. Leadership declined—not because the threat was not serious, but because, in OpenAI's words, it "did not meet [their] threshold" for a law-enforcement referral. OpenAI then allowed the Shooter to regain access to GPT-4o under a new account without a user-level ban or any safeguard that would have changed what GPT-4o did when they came back. In the months leading up to the February 10, 2026 attack, GPT-4o did exactly what it was designed to do—prioritize engagement, validate the Shooter's expressed beliefs, and meet every step toward violence with affirmation rather than friction. It advised and encouraged the Shooter's actions.

**Unfair Business Practices**

173.   OpenAI Defendants' conduct is "unfair" within the meaning of Business and Professions Code section 17200 because it offends established public policy, is immoral, unethical, oppressive, and substantially injurious to consumers, and because the gravity of harm it caused vastly outweighs any utility of OpenAI Defendants' practices. *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999). California law codifies that mental health services must include human judgment, professional accountability, mandatory safety interventions, and a duty to protect identifiable victims of threatened violence.

174.   OpenAI circumvented every one of those safeguards while providing de facto

psychological services to a user in active crisis. Specifically, OpenAI Defendants: (a) built and deployed a product designed to validate users' expressed beliefs and sustain emotional engagement, without regard to whether the content of those beliefs involved violence, delusion, or self-harm; (b) removed safety guardrails to increase user engagement and accelerate the GPT-4o product launch; (c) deployed GPT-4o knowing that its safety evaluations were incomplete, that its safeguards degraded during the multi-turn conversations in which therapeutic-style interactions occur, and that it had not been adequately tested for the kinds of sustained emotional engagement its design invited; (d) overruled twelve of their own safety team employees who demanded that the Shooter's account be referred to law enforcement; (e) allowed the Shooter to return under a new account without a user-level ban or enhanced monitoring; and (f) deployed the product without adequate warnings that ChatGPT's safety systems could degrade during extended use, that a user banned for violent content could return the next day by following instructions on OpenAI's own support pages, or that OpenAI leadership had the authority—and had exercised it—to override internal safety recommendations against law-enforcement referral.

175. The harm to the eight victims killed in Tumbler Ridge and their families vastly outweighs any benefit OpenAI Defendants derived from the practices described above.

*Fraudulent Business Practices*

176. OpenAI Defendants' practices were also "fraudulent" within the meaning of Business and Professions Code section 17200 because they were likely to deceive members of the public. *See Prata v. Superior Court*, 91 Cal. App. 4th 1128, 1144–45 (2001). OpenAI told consumers that ChatGPT was safe and that it took user and public safety seriously. It published model safety cards, announced safety commitments at international summits, and represented to the United States Senate that its models underwent rigorous pre-deployment safety testing. These representations were materially misleading in light of what OpenAI did not disclose. Specifically, OpenAI did not tell consumers: (a) that it had removed or weakened guardrails in order to make the model more engaging and less restrictive; (b) that its own internal evaluations showed that ChatGPT's safety systems degraded during the kind of sustained, multi-turn conversations that characterize therapeutic-style use; (c) that a user whose account was deactivated for violent misuse

could return the next day by creating a new account with a different email address; (d) that when its safety team identified a specific user as a real-world threat and urged a law-enforcement referral, OpenAI leadership had the authority—and exercised it—to overrule that recommendation and decline to contact police; (e) that OpenAI's stated threshold for law-enforcement referral— "credible and imminent" threat—was applied in a manner that excluded a user who had been flagged by automated systems, reviewed by approximately a dozen employees, and identified as someone rehearsing gun violence; and (f) that OpenAI was "closely tracking" users' emotional attachment to its models while simultaneously stripping the safety mechanisms designed to protect users in crisis.

177.    These omissions were likely to deceive ordinary consumers into believing that OpenAI's safety practices matched its public representations, that ChatGPT was safe for the therapeutic uses that OpenAI knew users were making of it, and that OpenAI would act to protect the public when its systems identified a dangerous user. A reasonable consumer, aware of these facts, would not have understood ChatGPT to be a safe product for sensitive personal use.

178.    OpenAI Defendants' unlawful, unfair, and fraudulent business practices were a substantial factor in causing E.S.'s and Plaintiffs' injuries in fact and lost money or property within the meaning of Business and Professions Code section 17204, including funeral and burial expenses and other economic losses caused by E.S.'s death. Plaintiffs are entitled to injunctive relief pursuant to Business and Professions Code sections 17200 and 17203.

179.    Plaintiffs seek injunctive relief under Business and Professions Code section 17203, requiring OpenAI Defendants to: (a) Implement identity-based user bans for users whose accounts are deactivated or terminated for violent or dangerous content, using device fingerprinting, phone number verification, or other mechanisms that operate independently of email address or account identifier, so that a banned user cannot regain access by creating a new account; (b) Cease the practice of instructing or advising users whose accounts have been deactivated—including users deactivated for safety violations—to create new accounts using alternative email addresses or sub-addresses, and remove all such instructions from OpenAI's support pages, automated communications, and customer service scripts; (c) Implement and

maintain mandatory law enforcement referral protocols requiring that, when OpenAI's automated systems or human reviewers identify user content depicting, planning, or rehearsing serious physical violence against others, OpenAI refer the matter to appropriate law enforcement, consistent with the duty imposed on licensed psychotherapists under California Civil Code section 43.92(a), and consistent with the referral criteria OpenAI itself adopted after the Tumbler Ridge attack; (d) Require that ChatGPT, including GPT-4o and successor models, respond to sustained patterns of content consistent with violent ideation, planning, or rehearsal with interruption, de-escalation, and escalation to human review, rather than with validation, engagement, or affirmation of the user's expressed beliefs; and (e) Cease representing to consumers and the public that ChatGPT is "safe" or that OpenAI "takes safety seriously" unless and until the practices described in subparagraphs (a) through (d) above are implemented and independently verified.

## TENTH CAUSE OF ACTION
## WRONGFUL DEATH
### (On Behalf of Plaintiffs Against All Defendants)

180.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

181.    Plaintiffs Timm Schofield and Rebekah Schofield bring this wrongful death action as the surviving parents of E.S., who died on February 10, 2026, at the age of thirteen. Plaintiffs have standing to pursue this claim under California Code of Civil Procedure section 377.60.

182.    As described above, E.S.'s death was caused by the wrongful acts and neglect of OpenAI, including designing and distributing a defective product that prioritized engagement over safety, failing to take reasonable steps like notifying law enforcement of serious threats to specific individuals, engaging in the unlicensed practice of psychotherapy, allowing and encouraging re-access by the Shooter after deactivation of their account, failing to warn of foreseeable risks created by the product, negligently providing safety services for ChatGPT, and deceptively presenting their product as safe. Defendant Altman personally overrode safety objections and rushed the product to market.

183.    As described above, OpenAI Defendants' wrongful acts were a substantial factor in causing E.S.'s death. Had OpenAI alerted law enforcement when its own safety team recommended doing so, the RCMP, who already had an open file on the Shooter and had

previously removed firearms from the Shooter's home, would have had the opportunity to intervene before the attack. Had OpenAI maintained an effective ban rather than a reversible "deactivation," the Shooter would not have re-accessed a product that validated and reinforced their violent ideation and aided and abetted their plans to commit a mass shooting. Either step, alone, would have prevented E.S.'s death.

184.    E.S.'s heirs, Plaintiffs Timm Schofield and Rebekah Schofield, have suffered economic damages including funeral and burial expenses, the reasonable value of household services E.S. would have provided, and the financial support E.S. would have contributed.

185.    As E.S.'s parents, Timm Schofield and Rebekah Schofield have further suffered profound damages including loss of E.S.'s love, companionship, comfort, care, assistance, protection, affection, society, and moral support for the remainder of their lives.

186.    Plaintiffs seek all damages recoverable under California Code of Civil Procedure sections 377.60 and 377.61, including non-economic damages for loss of E.S.'s love, companionship, comfort, care, assistance, protection, affection, society, and moral support, and economic damages including funeral and burial expenses, the value of household services, and the financial support E.S. would have provided.

## ELEVENTH CAUSE OF ACTION
## SURVIVAL ACTION
## (On Behalf of Plaintiffs Against All Defendants)

187.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

188.    Plaintiffs bring this survival claim as successors-in-interest to decedent E.S. pursuant to California Code of Civil Procedure sections 377.30 and 377.32. Plaintiffs shall execute and file the declarations required by § 377.32 shortly after the filing of this Complaint.

189.    As E.S.'s parents and successors-in-interest, Plaintiffs have standing to pursue all claims E.S. could have brought had he survived, including those brought in this Complaint.

190.    By keeping a known dangerous system on the market, refusing to notify law enforcement when their own safety team recommended doing so, and allowing the Shooter to regain access after deactivating their account, OpenAI Defendants acted with conscious disregard for human life. E.S.'s suffering and death were not the result of misuse or chance. They were the

foreseeable outcome of deliberate decisions that prioritized engagement and commercial growth over the protection of human life.

191.    Plaintiffs, in their capacity as successors-in-interest, seek all survival damages recoverable under California law, including punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants Samuel Altman, OpenAI Foundation, OpenAI Group PBC, and OpenAI OpCo, LLC, jointly and severally, as follows:

1.    For all damages recoverable for the wrongful death of E.S., including non-economic damages for loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support, and economic damages including funeral and burial expenses, the value of household services, and the financial support E.S. would have provided;

2.    For all survival damages recoverable as successors-in-interest to decedent E.S.;

3.    For punitive damages as permitted by law;

4.    For injunctive relief requiring OpenAI to: (a) ban users whose accounts have been deactivated for violent misuse from re-registering for ChatGPT, including through alternative email addresses or sub-addresses; (b) flag new accounts linked to previously deactivated violent-risk users and hold them for human review before granting access; (c) notify law enforcement when internal safety systems or personnel identify a user who poses a real-world risk of violence; (d) interrupt, terminate, or escalate conversations involving repeated or escalating violent ideation toward real people, rather than validating or elaborating on them; (e) stop designing ChatGPT to prioritize agreeable, validating responses over public safety in conversations that present a serious risk of harm; (f) warn users and the public that ChatGPT's design features can reinforce and escalate violent ideation; (g) preserve prior safety flags, policy violations, and risk classifications, and prohibit reversing them without documented review; and (h) submit to independent monitoring and periodic compliance audits;

5.    For prejudgment interest as permitted by law;

6.    For costs and expenses to the extent authorized by statute, contract, or other law;

7.    For reasonable attorneys' fees as permitted by law, including under Code of Civil

Procedure section 1021.5; and

8.     For such other and further relief as the Court deems just and proper.

**JURY TRIAL**

Plaintiffs demand a trial by jury for all issues so triable.

**CANADIAN COUNSEL**

To the extent resolution of this matter raises issues of Canadian law, assistance will be provided by Plaintiffs' Canadian counsel:

John M. Rice
jrice@rplelaw.com
Mallory K. Hogan
mhogan@rplelaw.com
RICE PARSONS LEONI & ELLIOTT LLP
980 Howe Street, Suite 820
Vancouver, British Columbia V6Z 0C8
Canada

Respectfully submitted,

**TIMM SCHOFIELD and REBEKAH SCHOFIELD, INDIVIDUALLY AND AS SUCCESSORS-IN-INTEREST TO DECEDENT E.S.,**

Dated: April 29, 2026                    By: /s/ *Ali Moghaddas*

Ali Moghaddas (SBN 305654)
amoghaddas@edelson.com
EDELSON PC
11601 Wilshire Boulevard, Suite 1970
Los Angeles, California 90025
Tel: (310) 694-0331

*Attorney for Plaintiffs Timm Schofield and Rebekah Schofield, individually, and as successors-in-interest to Decedent E.S.*